UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| COACHMEN INDUSTRIES, INC., | ) | |
| *et. al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CAUSE NO. 3:06-CV-160-CAN |
| v. | ) | |
| | ) | |
| KEMLITE, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

**I.    INTRODUCTION**

This case is a dispute over an alleged defective product.  For more than ten years, the

Plaintiff**,** Coachmen Industries Inc. ("Coachmen"), a leading recreational vehicle manufacturer,

purchased Defendant Kemlite's product, "Recreational Vehicle Filon" (RVF), without incident.

Specifically, Coachmen integrated Kemlite's RVF into the manufacturing process of exterior

sidewalls of its recreational vehicles.  All was well until the fall of 2004 when Coachmen began

to notice surface distortions on the sidewalls.  The distortions appeared as "cottage cheese" or

"toad skin" and were not viewed favorably by either Coachmen or its customers.  In a nutshell,

Coachmen alleges that Kemlite did something to its product that caused the surface distortions,

and, therefore, they allege the product is defective.  Coachmen's legal theories for recovery

sound in breach of contract and breach of warranty of merchantability and fitness for a particular

purpose.

Kemlite responds by denying that its product was defective and instead points to

Coachmen's manufacturing process as the likely cause.

At the core of this dispute is the legal issue of causation, and each side has retained the services of at least one expert to support its theory. Both parties have filed motions challenging the opinions of the opposing experts, and each has filed a motion for summary judgment. Each has argued that there are no disputes as to material facts and that each is entitled to a judgment as a matter of law. This Court disagrees. And because the Court concludes that there are material facts in dispute, particularly with respect to causation, this Court must deny both motions for summary judgment. This Opinion and Order will now explain the reasons for the Court's conclusions.

## II. PROCEDURE

On July 1, 2008, Defendant Kemlite[1] filed a motion for summary judgment. On August 4, 2008, Plaintiff Coachmen Industries Inc. ("Coachmen") filed a response. On August 22, 2008, Kemlite filed a reply. Also, on July 1, 2008, Kemlite also filed three motions to exclude the testimony of Coachmen's experts, Michael L. Hanks Ph.D. ("Hanks"), Branch Engineering LLC ("Branch"), and Francis M. Burke ("Burke"). Finally, on July 1, 2008, Kemlite filed a motion for oral argument regarding its motions to exclude. On July 21, 2008, Coachmen responded to each of Kemlite's motions to exclude. On July 31, 2008, Kemlite filed replies to Coachmen's responses.

On July 1, 2008, Coachmen filed a motion for partial summary judgment. On August 4, 2008, Kemlite filed a response. On August 22, 2008, Coachmen filed a reply. Also, on July 1, 2008, Coachmen filed a motion to exclude the testimony of Kemlite's experts, Andrew T. Armstrong ("Armstrong") and Cecil Thompson ("Thompson"). On July 21, 2008, Coachmen

---

[1] Kemlite is currently known as Crane Composites Inc. However, for the sake of minimizing confusion, this Court will continue to refer to the Defendant as Kemlite.

filed a motion for oral argument regarding its motion to exclude. Also, on July 21, 2008, Kemlite responded to Coachmen's motion to exclude. On August 4, 2008, Coachmen filed a reply to Kemlite's response.

## II. RELEVANT BACKGROUND

Kemlite manufactures fiberglass reinforced plastic panels commonly referred to as "Recreational Vehicle Filon" ("Filon" or "RVF"). As part of a complex manufacturing process, Coachmen incorporated Filon panels, purchased from Kemlite, into the exterior sidewalls of recreational vehicles. Specifically, Coachmen would run a piece of Filon through a liquid urethane adhesive machine, and Coachmen would then run a piece of raw lauan through the liquid urethane machine and place the lauan on top of the Filon. A wall structure containing the interior panels and styrofoam was then placed on top of the Filon, and the entire panel was placed in a vacuum table where pressure was applied. Alternatively, Coachmen would use a hot melt adhesive process to bond the interior substrate and the frame. Boulton Dep., Doc. No. 160-9 at 2.

From 1993 to 2004, Coachmen purchased Filon from Kemlite without incident. However, beginning in the fall of 2004, Coachmen experienced a number of surface distortion issues with their sidewalls in the field. The distortion manifested itself as an intense wrinkling of the surface of the RV wall, which Coachmen has likened to the appearance of "cottage cheese." Coachmen noted a higher prevalence of the distortions in RVs manufactured between 2004 and 2006, in RVs which had been exposed to hot climates such as the Southwestern United States.

As a result of the distortion issue, Coachmen conducted an internal audit of its processes and implemented several changes in its manufacturing process. These changes included changes

3

in the application of the lauan adhesive and an increase in the number of employees engaged in quality control. Meanwhile, it became known that Kemlite's resin supplier had made adjustments in the percentage of malehic anhydide ("MA") in the Filon resin, contemporaneously with the onset of the distortions. See Hanks' Supplemental Report, Doc. No. 158-5 at 2-3. Both parties have submitted expert witnesses to assist in establishing causation. Coachmen's experts point to chemical changes made to Kemlite's resin, while Kemlite's experts point to changes in Coachmen's manufacturing processes. This Court may now enter its ruling on all pending matters pursuant to the parties' consent and 28 U.S.C. § 636(c).

III.    **F.R.E. 702**

Fed. R. Evid. 702 states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 has liberalized the standard for qualifying as an expert witness. *Wilson v. City of Chi.*, 6 F.3d 1233, 1238 (7th Cir. 1993). As a threshold matter, courts must examine whether 1) the expert will testify to valid scientific knowledge, and 2) whether that testimony will assist the trier of fact in understanding or determining a fact in issue. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 (1993); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (holding that "the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case"). In *Kumho Tire Co., Ltd. v.*

*Carmichael,* 526 U.S. 137, 149 (1999), the Supreme Court held that this inquiry must be taken in all matters relating to expert testimony and not only in those that contain scientific testimony.

Courts must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusion is reliable. <u>See</u> *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004). A witness does not need to put forth testimony in a scientific or technical manner to be considered an expert. *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Experts can be qualified to testify based upon personal experience and knowledge, so long as the experience and knowledge is reliable. *Kumho Tire*, 526 U.S. at 150; *Smith*, 215 F.3d at 718; *Tuf Racing*, 223 F.3d at 591. A court should examine the full range of practical experience and technical training, as well as examine the methodology used in reaching a conclusion when deciding whether an expert is qualified to testify. *Smith*, 215 F.3d at 718. However, offering only a bottom line conclusion does not assist the trier of fact and should not be admitted. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.* 395 F.3d 416, 420 (7th Cir. 2005); *Lennon v. Norfolk and Western Ry. Co.*, 123 F.Supp.2d 1143, 1147 (N.D. Ind. 2000).

A district court must act as a "gatekeeper" to ensure that any and all expert testimony or evidence admitted is not only relevant but reliable. *Ramsey v. Consol. Rail Corp.* 111 F.Supp.2d 1030, 1036 (N.D. Ind. 2000). It is not the responsibility of the trial court to determine whether the expert's opinion is correct. *Smith*, 215 F.3d at 719. The factual underpinnings of the analysis and the correctness of the conclusions are matters to be determined by the trier of fact. <u>Id.</u> at 718.

A.     Defendant's Motion to Exclude Plaintiff's Expert Francis M. Burke

In his report, Burke opined that he "strongly believed that the root cause of the FRP lies with Kemlite FRP." See Burke Report, Doc. No. 143-10 at 3.  Specifically, Burke declared that the distortion was likely the result of a problem with either Kemlite's materials or processes. Id. In reaching his opinion, Burke utilized Six Sigma methodology to audit Coachmen's manufacturing processes in an attempt to isolate potential causes of the distortion. See Burke Report, Doc. No. 143-10 at 1.  Six Sigma is a research method which attempts to isolate potential causal factors through a series of controlled experiments and statistical analysis to narrow the potential number of casual factors.[2] See Burke Aff., Doc. No. 156-8 at 2.

Despite reaching his opinion with "75%-90% certainty," Burke later admitted that he could not identify the root cause of the distortion.  See Burke Dep., Doc. No. 143-5 at 1; see also Burke Dep., Doc. No. 145-5 at 3.  Further, in his deposition, Burke stated that he could not determine whether the problem originated with Kemlite's materials or with Kemlite's processes. See Burke Dep., Doc. No. 143-5 at 1.  Instead, Burke acknowledged that more testing would be needed to determine whether the issue was the result of chemical or manufacturing defects at Kemlite. See Burke Dep., Doc. No. 143-5 at 6.

While Kemlite does not object to Burke testifying as a lay witness concerning his tests and their results, it does object to Burke being designated an expert witness under F.R.E. 702. Kemlite argues that Burke's expertise in process improvement does not qualify him to testify as an expert regarding causation because the particular case involves chemical processes which are

---

[2] See Fueger v. Case Corp., 886 N.E.2d 102, 106 n1 ("Six sigma is a methodology of defining, measuring , analyzing, improving, and controlling the quality in every one of a company's products, processes, and transactions- with the ultimate goal of virtually eliminating all defects.").

outside of Burke's stated expertise. In addition, Kemlite contends that Burke failed to consider alternative factors in reaching his conclusion, thereby rendering Burke's methods unreliable. Specifically, Kemlite notes that, even though Burke himself ordered changes in the application of lauan as part of his quality control audit, Burke did not explain why lauan problems were not potential contributing factors in the RVF distortion.

### 1. Sufficient Facts or Data

Kemlite does not challenge Burke's credentials as an expert in process improvement nor does Kemlite challenge Burke's expertise in applying Sigma Six experimental methodologies. However, Kemlite contends that Burke's expertise is not applicable to the specific and complicated causal issues in this case. This Court agrees with Kemlite that, although Burke is an expert in process control, Burke is not qualified to give expert testimony regarding the complex relationships between adhesive bonding techniques, the chemical makeup of RVF, and the physical properties of lauan, each critical factors in this case.

F.R.E. 702 is flexible and permits a witness to be qualified as an expert if she is qualified by knowledge, skill, experience, or education. *U.S. v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). A combination of experience and inspection of hard evidence or records may be sufficient to meet the first prong of F.R.E. 702. Id. However, the subject matter of an expert's proffered testimony must be within the scope of the expert's area of specialized knowledge. See *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999) (excluding expert's testimony because the subject matter of the proffered testimony was outside the expert's area of specialized knowledge). See also *U.S. v. Hirschberg*, 988 F.2d 1509, 1514 (7th Cir. 1991) ("Expert opinion

is gained from a special skill, knowledge, or experience, and is a reasoned decision drawn from the witness' expertise") (internal quotations omitted).

Burke holds a Bachelor of Science degree in ceramic engineering. In addition, Burke has twenty years of experience in product and process improvement methods and applied statistics. Further, it is clear that Burke is familiar with implementing Six Sigma methodology. However, Burke's expertise, while applicable to improving manufacturing systems, is not applicable to identifying complex chemical interactions between multiple industrial materials. For instance, although Burke stated that he was "knowledgeable" or "somewhat knowledgeable" regarding the physical properties of adhesives, lauan, and reinforced fiberglass plastics, Burke did not become familiar with Coachmen's lamination or liquid urethane processes until after the distortion issue arose. See Burke Dep., Doc. No. 143-7 at 4; Burke Dep., Doc. No. 143-2 at 5. Further, Burke acknowledged that his knowledge did not extend "to the level of understanding the chemistry and so forth." Burke Dep., Doc. No. 143-7 at 4.

While understanding the complex industrial processes at use in this case is important, the ability of a expert witness to appreciate the chemical and physical interplay between the various components is critical to support an expert opinion regarding causation. Burke may be qualified to provide lay testimony regarding the results of his statistical analysis and control experimentation, under F.R.E. 701. However, without advanced training regarding the complex chemical reactions at play in this case, Burke is not qualified to provide expert testimony regarding causation. See Jones, 188 F.3d at 723-24.

Indeed, Kemlite does not dispute Burke's credentials to give lay testimony regarding his implementation of process controls and his relevant observations. Instead, Kemlite argues only

that Burke's lay testimony should not be given "expert" status at trial. This Court agrees with Kemlite's characterization of Burke's testimony, delineating it inadmissible as expert testimony but admissible as lay evidence, circumstantial to the issue of causation.[3]

B.      Defendant's Motion to Exclude Plaintiff's Expert Brach Engineering LLC

The expert report proffered by Brach Engineering concludes that "one or more of the characteristics of Kemlite's Filon FRP *likely* is the cause of the skin distortion." See *Brach Report*, Doc. No. 155-21 at 13 (emphasis added). On the first page, however, the report notes that Brach Engineering's investigation "did not lead to a specific cause of the problem." See *Brach Report*, Doc. No. 155-21 at 1; see also Id. at 3. Instead, the report states, "[f]urther evaluation of the matter for root cause analysis depends on the availability or acquisition of additional information." See *Brach Report*, Doc. No. 155-21 at 3.

Kemlite challenges the admissibility of Brach Engineering's expert report on two grounds: (1) that the Brachs are not qualified in the relevant area of expertise; and (2) that Brach Engineering relied solely on general engineering principles and failed to conduct any tests to determine causation.

1.      Sufficient Facts or Data

The mere fact that an individual has exemplary educational qualifications does not necessarily qualify him as an expert witness for every potential topic. See e.g. *Smith v. Ford Motor Co.*, 882 F.Supp. 770, 772 (N.D.Ind. 1995) (holding that a auto mechanic was not qualified to testify regarding the design of the fuel and electrical systems of a particular type of truck); see also *Baldauf v. Davidson*, 2007 WL 2155967 *3 (S.D.Ind. 2007) (finding a doctor

---

[3] Because this Court has found that Burke's testimony is inadmissible as expert testimony, this Court need not also address Kemlite's contentions that Burke failed to test alternative factors.

unqualified to testify as to all medically related fields). Instead, the subject matter of an expert's proffered testimony must be within the scope of the expert's area of specialized knowledge. <u>See</u> *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723-24 (7th Cir. 1999).

Kemlite contends that the Brachs' area of expertise, forensic engineering, is not relevant to the immediate matter, rendering Dr. Raymond M. Brach and Dr. Matthew Brach unqualified to testify as experts. In particular, Kemlite argues that the Brachs' area of expertise is limited to accident reconstruction. <u>See</u> <u>e.g.</u> R. Branch Dep, Doc. No. 141-5 at 1. Coachman responds that both of the Brachs have extensive education and years of experience in forensic engineering. Dr. Raymond M. Branch holds a Ph.D. in Engineering Mechanics; and his son, R. Matthew Branch, holds a Ph.D. in Mechanical Engineering. <u>See</u> R. Branch Curriculum Vitae, Doc. No. 141-2 at 1; R.M. Branch Curriculum Vitae, Doc. No. 141-7 at 4. Both have extensive experience as testifying experts regarding automobile accident reconstruction. <u>See</u> R. Branch Dep, Doc. No. 141-5 at 2; R. Branch Curriculum Vitae, Doc. No. 141-2 at 3; R. M. Branch Dep, Doc. No. 141-10 at 1. This Court is not as concerned with the Brachs' credentials as it is with the failure of Brach Engineering to actually apply those credentials to the facts of this case.

2.    <u>Reliable Principles and Methods</u>

Possessing requisite credentials alone is not enough to render expert testimony admissible. *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005) (overruled on other grounds by *Fuesting v. Zimmer*, 421 F.3d 936 (7th Cir. 2006)). This Court must also analyze whether Brach Engineering utilized reliable principles and methods pursuant to F.R.E. 702 to ensure that Brach Engineering offers more than simply its subjective belief or speculation, which is a bottom line opinion. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-420

(7th Cir. 2005). Courts use four non-exclusive factors to help them determine reliability of a method or process. They are: 1) the extent to which the theory has been or can be tested; 2) whether the theory has been subjected to peer review and/or publication; 3) the theory's known or potential rate of error; and 4) the general acceptance of the theory in the relevant scientific or professional community. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).

In creating its expert report, Brach Engineering explains that it relied exclusively on "the material assembled by Coachmen in a binder furnished to Brach Engineering labeled 'Due Diligence.'"[4] See Brach Engineering Report, Doc. No. 141-12 at 3. Further, Brach Engineering explains its methodology as "involved in the interpretation of this information and data to discern relationships between the various factors identified in the review of the information." Id. at 1.

Kemlite contends that Brach Engineering did not conduct any tests or analysis to reach its conclusions but merely "parroted" the conclusions of Coachmen's expert Raymond Burke. Coachmen concedes that Brach Engineering did not engage in any testing but argues that Brach Engineering utilized its unique engineering qualifications to review the data from a different perspective from that of Mr. Burke. See Coachmen's Res., Doc. No. 155 at 17; see also R. Brach Dep., Doc. No 141-5 at 4. In addition, in a late-filed affidavit,[5] Coachmen asserts that Brach

---

[4] The "Due Dilligence" binder was an assembly of data, gathered as the result of Raymond Burke's investigation of causation. See generally Doc No. 155-4 through Doc. No. 155-20. Raymond Burke is one of Coachmen's proffered experts regarding causation.

[5] Brach's Affidavit was signed July 20, 2008, the day before Kemlite submitted its response. See R. Brach Affidavit, Doc. No. 155-26 at 4. Kemlite asserts that it is prejudiced by Coachmen's late-filed affidavit, used to "shore up" weaknesses in Coachmen's expert reports, and asks that this court should disregard any evidence therein. See *Leviton Mfg. Co., Inc. v. Nicor, Inc.*, 245 F.R.D. 524, 531 (D.N.M. 2007) (stating that FED. R. CIV. P. 26(e) does not "give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' original report."). This Court is cognizant of Kemlite's objection and references the affidavit only to show that this Court finds Branch Engineering's methods to be unreliable, as applied, even after considering the offending evidence.

Engineering applied a statistical analysis known as "factorial design" to analyze the data. See R. Brach Affidavit, Doc. No. 155-26 at 3 ¶ 10. Kemlite responds that, despite Coachmen's affidavit, Brach Engineering's report offers no explanation regarding the scope of its factorial design analysis, how the methodology was applied, or what specific data was reviewed. Instead, Kemlite contends that Brach Engineering impermissibly relied on general engineering principles without any independent analysis.

"A district court may exclude testimony if the analytic gap between the data and the conclusion are too great." *Cunningham v. Masterwear, Inc.*, 2007 WL 1164832 * (S.D.Ind. 2007). Merely discussing causation theories without testing or further experimentation to verify the theories, or to discount other theories, does not constitute a valid method sufficient to support an expert opinion. *Fuesting*, 421 F.3d 528, 535-36 (7th Cir. 2005); *Chapman*, 297 F.3d at 688.

This Court agrees with Kemlite that Brach Engineering did not conduct any independent analysis in reaching its conclusions. Other than merely repeating that Brach Engineering took a different approach than Raymond Burke in reviewing the data, employing engineering principles rather than quality control principles, Coachmen offers no clear explanation regarding what specific methods Brach employed and how those methods were applied to the facts in this case.

As such, it appears that Brach Engineering impermissibly relied solely on general engineering principles and failed to apply a specific analytical approach to reach its conclusions. Such a methodology or, rather, lack of methodology has been viewed unfavorably in this Circuit. See *Fuesting*, 421 F.3d at 536 (dismissing an expert witness because the expert "did not bridge the analytical gap between [the] basic principles and his complex conclusions."). Interpreting and reviewing information is not the same as putting the information through the analytical scrutiny required of expert testimony. See *Chapman*, 297 F.3d at 688 ("Personal observation is

not a substitute for a scientific methodology and is insufficient to satisfy <u>Daubert's</u> most

significant guidepost.").

Further, as a result of Brach Engineering's failure to apply more than "general

engineering principles" to reach its conclusions, Brach Engineering's conclusions are nothing

more than an affirmation of those made by Raymond Burke's. As such, the results of Brach

Engineering's report are inadmissible at trial as expert testimony. <u>See</u> *Dura Auto. Sys. of Ind.,*

*Inc. v. CTS Corp.,* 285 F.3d 609, 614 (7th Cir. 2002) ("[A] scientist, however well credentialed

he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

C.    <u>Defendant's Motion to Exclude Plaintiff's Expert Dr. Michael L. Hanks</u>

Dr. Hanks' expert testimony consists of two reports and two interlocking opinions. In his

initial report Dr. Hanks concluded,

> Based on the testing completed to date, and on the information reviewed, the most
> likely cause of the skin distortion is thermal expansion of the Filon that resulted in
> localized buckling of the Filon. . . The Filon Tg was lower during the time frame in
> which the skin distortion issue occurred than it was after the issue subsided. Based
> on this fact, changes in the Filon raw materials, processing or formulation are most
> likely the main factor leading to the skin distortion issue.

Hanks' Report, Doc. No. 158-4 at 17.

Following his initial report, new information revealed that several changes had been

made in the Kemlite resin contemporaneously with the onset of the skin distortions, in particular

there was a decrease in the percentage of maleic anhydride ("MA"). <u>See</u> Hanks' Supplemental

Report, Doc. No. 158-5 at 2-3. Based on a review of this new information, Dr. Hanks

supplemented his initial opinion, stating,

> The significance of the changes made to the [ ] resin is that reducing the amount of
> MA in the resin would be expected to reduce the thermal stability of the Filon panels.
> . . . In my initial report I concluded that some change or variability in the Filon most
> likely was the most significant factor in the skin deformation defect. The

> modifications made to the [ ] resin are consistent with this conclusion. The timing of the final decrease in maleic anhydride (MA) and the resin corresponds with the time frame in which the skin deformation problem began, and is most likely the key factor in initiating the skin deformation defect issue.

Id. at 6.

Kemlite challenges that Dr. Hanks failed to test his theory that the specific changes in MA levels in the resin was the cause of the distortion issues. In addition, Kemlite argues that Dr. Hanks failed to explain why other factors were not responsible for the distortions.

### 1. Sufficient Facts or Data

Kemlite concedes and this Court agrees that Dr. Michael Hanks ("Dr. Hanks") is qualified to testify as an expert. Dr. Hanks has a Ph.D. in Chemical Engineering and has 16 years of industrial experience testing plastic components and investigating failures of plastics and adhesives.

### 2. Reliable Principles and Methods

While Kemlite acknowledges that Dr. Hanks performed numerous tests to determine potential causal factors, Kemlite argues that Dr. Hanks did not conduct the tests necessary to support his ultimate conclusion. Specifically, Kemlite contends that Dr. Hanks did not conduct any tests to determine that the specific changes made to the MA resin values were "most likely"responsible for the distortions. As such, Kemlite argues that Dr. Hanks methodology is unreliable, rendering his conclusion an inadmissable "bottom line" opinion regarding causation.

It is clear that Dr. Hanks engaged in numerous scientific tests in search of potential causal factors for the distortions at issue. For instance, Dr. Hanks performed heat tests on wall samples responding to evidence that distortions occurred at higher frequencies in places where the walls were exposed to higher temperatures. Hanks' Report, Doc. No. 158-4 at 14-16; Hanks

Dep., Doc. No. 158-7 at 21-22, 40-41; Barney Dep., Doc. No. 158-2 at 5. In addition, Dr. Hanks

sent RVF Filon wall panel samples to a laboratory for testing of the chemical composition of the

RVF Filon. Hanks Dep., Doc. No. 158-7 at 29, 52-65. Two tests returned inconclusive, but two

revealed that changes in Tg values[6] in the wall samples were coetaneous with a rise in distortion

rates, lower when failures increased and higher when failures decreased. Hanks Dep., Doc. No.

158-7 at 29, 36, 38-39, 52-65; Hanks' Report, Doc. No. 158-4 at 14-15. Dr. Hanks followed up

with research of technical literature and concluded that the amount of MA in a polyester resin

can affects the thermal stability of the final product. Hanks Dep., Doc. No. 158-7 at 13-14.

These tests formed the basis of Dr. Hanks' initial opinion that a chemical change in Kemlite's

RVF Filon was more likely the cause of the failures.

After it was revealed that changes were made to MA levels in the RVF resin,

contemporaneous with the increased rate of distortions, Dr. Hanks supplemented his original

conclusion to identify the MA changes as the previously undetermined chemical change in the

RVF Filon that was most likely the cause of the distortion issues. Hanks' Supplemental Report,

Doc. No. 158-5 at 6. Kemlite's objection to Dr. Hanks' methodology is narrowly focused at this

point in Dr. Hanks' investigation. Specifically, Kemlite points out that Dr. Hanks did not

conduct any follow up testing to determine whether the *specific* changes actually made in the

MA resin were significant enough to set in motion the chemical processes that form the basis of

Dr. Hank's theory. In support, Kemlite notes Dr. Hanks' deposition testimony in which he

_____

[6] The DSC and DMA tests yielded data relating to the Tg of the RVF Filon material. Hanks' Report, Doc.
No. 158-4 at 14-16. Tg (or glass transition temperature) indicates the temperature at which a material exposed to heat
begins to soften and lose its strength and many other properties begin to change. Hanks Dep., Doc. No. 158-7, at 37-
39. . When a material is near its Tg, small changes in temperature can result in significant changes in the material's
strength, thermal expansion and other physical and mechanical properties. Hanks Dep., Doc. No. 158-7 at 39; Hanks
Report, Doc. No. 158-4 at 4.

acknowledged that more scientific testing would be necessary to determine whether the specific changes in MA values were "significant."  Hanks Dep., Doc. No. 139-5 at 5.

While Kemlite's argument may be persuasive as to the weight that should be afforded to Dr. Hanks' testimony, it is too narrowly focused to support a conclusion that Dr. Hanks failed to test his theory.  The evidence is clear that Dr. Hanks did a great deal of testing to reach his original conclusion that a chemical change in Kemlite's RVF Filon "most likely" caused the distortions.  Although, Dr. Hanks could not pinpoint the exact chemical change responsible, fluctuating Tg values in the RVF Filon samples suggested that *some* chemical change in the RVF Filon was affecting the Filon's thermal stability.  Further, scholarly research led Dr. Hanks to conclude that a change in MA values could cause a fluctuation in Tg values similar to the one evidenced by the samples.  This was Dr. Hanks' original conclusion, a conclusion that Kemlite did not take serious issue with in any of its briefs.

After it was revealed that Kemlite's resin supplier had been making changes to the MA levels, contemporaneous with the time period in which there was a rise in the number of distortions, Dr. Hanks briefly supplemented his original report.  In his supplement, Dr. Hanks pointed to the changes in MA as the "likely" chemical change that brought about the distortion, which Dr. Hanks had previously determined but had failed to pinpoint.  Kemlite contends that, although Dr. Hanks conducted tests which, in part, demonstrated that RVF Filon produced contemporaneously with the MA reduction had low Tg values, and although Dr. Hanks did scholarly research on the chemical relationship between MA and polymers exposed to heat, Dr. Hanks' admission that he did not verify the significance of the *actual changes* in MA values is tantamount to "no testing" of Dr. Hanks' opinion.  As such, Kemlite characterizes Dr. Hanks' supplemental conclusion as entirely new and a logical leap that Dr. Hanks failed to verify

through the scientific method, rather than a supplement to Dr. Hanks' original theory. This Court cannot agree.

While it is true that Dr. Hanks admitted that he did not test the specific changes in MA levels in order to independently verify their significance to the corresponding changes in Tg values, Dr. Hanks had already established through his previous testing and research that the Tg values had fluctuated during the requisite time period and that MA levels have a causal effect on the thermal stability (Tg) of polymers. Dr. Hanks originally concluded that the cause of the distortion was "most likely" some chemical change in Kemlite's RVF Filon. Although Dr. Hanks could not pinpoint the exact change at issue, clearly fluctuating Tg values in the RVF Filon samples suggested that some chemical change in the RVF Filon was affecting the Filon's thermal stability. When it was later revealed that MA changes were being made during the requisite time period, Hanks supplemented his report to emphasize how the new evidence comported with his prior research and conclusions.

Understood in *toto*, Dr. Hanks' conclusion regarding changes to the MA cannot be seen as a significant shift from his original opinion. Instead, this Court interprets Dr. Hanks' conclusion regarding the changes in MA values as an extension and verification of his original, thoroughly tested opinion. Rather than dramatically altering his original conclusion, Dr. Hanks' supplemental report merely clarified it through the application of previously undiscovered evidence. As such, Kemlite's contention that Dr. Hanks did not test whether the actual MA changes were significant enough to impact the Tg values is too narrow to warrant the exclusion of Dr. Hanks' testimony for failure to test his theory. Instead, this Court concludes that Kemlite's arguments are more properly made to the jury as they are the final judges as to the weight that should be given to Dr. Hanks' opinions.

### 3. Consideration of Other Factors

Finally, this Court must consider whether Dr. Hanks adequately accounted for obvious alternative explanations. *Fuesting*, 421 F.3d at 534-35; *Tucker v. Nike, Inc.*, 919 F.Supp. 1192, 1198 (N.D. Ind. 1995). Kemlite argues that Dr. Hanks did not consider the effect of gaps in glue coverage in creating the distortions at issue. Coachmen responds that Dr. Hanks considered and acknowledged numerous other factors. Having determined that the other factors were present prior to the rise in distortions, Dr. Hanks distinguished his theory due to the temporal proximity between chemical changes in RVF Filon and the spike in distortion issues. Hanks Report, Doc. No. 161-11 at 18-19; Hanks Supp. Report, Doc. No. 161-11 at 26; Hanks Dep., Doc. No. 158-7 at 20.

This Court agrees that an expert's conclusion "should not be excluded because he or she has failed to rule out every possible alternative cause." *Troutner v. Marten Transp., Ltd.*, 2006 WL 3523542 at *4 (N.D. Ind. 2006). Instead, so long as an expert offers some explanation why the alternative factor could not have been the sole cause, the expert's failure to address alternative causes affects the weight the jury should give the evidence, not its admissibility. Id. ("the alternative explanations requirement cannot be carried to a quixotic extreme."). In the immediate case, Dr. Hanks acknowledged and tested numerous other factors but expressed that the temporal relationship suggested that changes in the RVF Filon were most likely the cause of the distortion issue. As such, Dr. Hanks has provided some plausible explanation regarding why he believes that the other factors were not the sole cause of the distortion. Consequently, Kemlite's concerns are best considered at trial, in the context of cross-examination, rather than at the present stage, for the purpose of excluding Dr. Hanks' testimony altogether. See *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-720 (7th Cir. 2000); *Cooper v. Carl A. Nelson & Co.*, 211

18

F.3d 1008, 1021 (7th Cir. 2000). Accordingly, this Court concludes that Dr. Hanks' expert testimony is admissible at trial.

C.     Plaintiff's Motion to Exclude Defendant's Expert Dr. Andrew T. Armstrong

Dr. Andrew Armstrong opines that adhesive failure, exacerbated by changes in lauan moisture and gaps in glue coverage, caused the sidewall distortion. Armstrong Report, Doc. No. 154-4 at 29; Armstrong Dep., Doc. No. 154-2 at 7-8. Specifically, Dr. Armstrong believes that, as moisture levels changed in the lauan, stress was increased on the sidewall in places where glue coverage was incomplete, causing the Filon to distort in those areas. Id. Coachman challenges that Dr. Armstrong failed to test the specific Filon at issue in this case and argues that Dr. Armstrong did not consider or test for other possible factors.

1.     Sufficient Facts or Data

Coachman concedes that Dr. Armstrong has the necessary credentials to opine as an expert in this case, and this Court agrees. Dr. Armstrong is the principal of Armstrong Forensic Laboratories, which specializes in the chemical and physical evaluations of materials.

2.     Reliable Principles and Methods

This Court must also analyze whether Dr. Armstrong utilized reliable principles and methods pursuant to F.R.E. 702 to ensure that Dr. Armstrong offers more than simply his subjective belief or speculation, which is a bottom line opinion. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-420 (7th Cir. 2005).

After reviewing the data submitted by both Coachmen and Kemlite, Dr. Armstrong developed a controlled system to test the effect of stress on Filon, in the presence of glue voids. Armstrong Report, Doc. No. 154-4 at 4-16; Armstrong Dep., Doc. No. 154-2 at 6-7. As part of his analysis, Dr. Armstrong tested three sidewall "systems," each with a different type of Filon.

Id. From these tests, Dr. Armstrong concluded that distortions were more likely to occur as the lauan dried in places where the glue coverage was not complete. Armstrong Report, Doc. No. 154-4 at 29; Armstrong Dep., Doc. No. 154-2 at 7-8.

Coachmen raises numerous challenges to Dr. Armstrong's methods. Most significantly, Coachmen notes that Dr. Armstrong did not test any panels from the field and did not test the specific RVF Filon at issue. Armstrong Dep., Doc. No. 154-2 at 4; Doc. No. 154-3 at 4, 6; Doc. No. 161-20 at 7. Instead, Coachmen points out that Dr. Armstrong tested other Filon materials, which Kemlite supplied to Dr. Armstrong for testing. Armstrong Dep., Doc. No. 161-20 at 7. One of these products, GIII, was created by Kemlite to be more chemically robust than the RVF Filon at issue in this case. Barney Dep., Doc. No. 161-4 at 8-12. Specifically, GIII was composed of a blend of resins, rather than a single resin base, and was designed to have a higher Tg value than RVF Filon. Barney Dep., Doc. No. 161-4 at 8-12; Aycock Dep., Doc. No. 161-21 at 4. Similarly, Coachmen asserts that Lamilux 1000, one of the other products tested by Dr. Armstrong, has not been shown to have a similar chemical formulation as RVF Filon. In addition, Coachmen points out that Dr. Armstrong did not compare or account for the chemical differences between the Filon materials supplied by Kemlite and the Filon product at issue in this case, despite Dr. Armstrong's admission that various Filons may have different thermal properties and may perform differently in the field. Armstrong Dep., Doc. No.161-20 at 7-9, 27.

Kemlite responds that it was not necessary for Dr. Armstrong to test the exact Filon at issue because it was not relevant to Dr. Armstrong's theory. Instead, Kemlite argues that Dr. Armstrong tested the sidewall "system" as a whole, to determine what caused the failure, rather than focusing on a single component part. Armstrong Dep., Doc. No. 154-2 at 6-7. Using an comparable integrated sidewall system, controlled to have a similar structure as a sidewall in the

field, Dr. Armstrong determined that a failure in glue coverage could cause the distortion at issue. Accordingly, because Dr. Armstrong's tests showed a potential causal factor, Kemlite contends that testing the chemical properties of the actual components was not necessary to verify causation. Id.

It is apparent to this Court that Dr. Armstrong adequately developed and tested a theory of causation. Although there may have been variables that Dr. Armstrong may not have accounted for, Dr. Armstrong's "macro" approach was consistent with his "system"-stress hypothesis. While it is relevant and potentially damaging to the integrity of Dr. Armstrong's ultimate conclusion, the fact that Dr. Armstrong did not test the specific product at issue and did not test actual sidewalls from the field does not diminish that Dr. Armstrong tested his theory in accordance with scientific principles. As such, Coachmen's concerns, while relevant for cross-examination purposes at trial, should not prevent Dr. Armstrong from testifying as an expert.

### 3. Consideration of Other Factors

Finally, this Court must consider whether Dr. Armstrong adequately accounted for obvious alternative explanations. *Fuesting*, 421 F.3d at 534-35; *Tucker v. Nike, Inc.*, 919 F.Supp. 1192, 1198 (N.D. Ind. 1995). Coachmen argues that Dr. Armstrong did not consider the chemical differences between the Filons provided by Kemlite and the RVF Filon at issue in this case. Specifically, Coachmen notes that Dr. Armstrong did not test the hardness, the Tg values, the thickness, or the dyne of the Filons. Armstrong Dep., Doc. No. 161-20 at 14-15. In addition, Coachmen argues that Armstrong failed to account for variances in glue application and humidity levels at Coachmen's plant. Id. at 14, 42. Kemlite responds that Dr. Armstrong did not believe it necessary to account for these other factors because his results showed the system consistently under stress, regardless of the type of Filon provided. Id. at 27.

This Court agrees that an expert's conclusion "should not be excluded because he or she has failed to rule out every possible alternative cause." *Troutner v. Marten Transp., Ltd.*, 2006 WL 3523542 at *4 (N.D. Ind. 2006). Instead, so long as an expert offers some explanation why the alternative factor could not have been the sole cause, the expert's failure to address alternative causes affects the weight the jury should give the evidence, not its admissibility. Id. ("the alternative explanations requirement cannot be carried to a quixotic extreme."). In the immediate case, Dr. Armstrong expressed that he did not believe it necessary to account for the differences in chemical properties of the available Filons because the system repeatedly failed under stress, regardless of the type of Filon used. Armstrong Dep., Doc. No. 161-20 at 27. As such, Dr. Armstrong has provided some plausible explanation why he did not consider the chemical makeup of the Filon, including low Tg values, the sole cause of the distortion. Consequently, Coachmen's concerns are best considered at trial, in the context of cross-examination, rather than at the present stage, for the purpose of excluding Dr. Armstrong's testimony altogether. See *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-720 (7th Cir. 2000); *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000). Accordingly, this Court concludes that Dr. Armstrong's expert testimony is admissible at trial.

**IV.    SUMMARY JUDGMENT**

A.    Standard of Review

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in

the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999). To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Serv.s Co.*, 391 U.S. 253, 289 (1968)).

      B.    <u>Cross Motions for Summary Judgment</u>

           1.    <u>Expert Testimony is Necessary to Prove a Defect that is Causally Responsible for Coachmen's Damages</u>

Coachmen argues that a problem with Kemlite's RVF was responsible for the distortion and delamination issues. As such, Coachmen claims that Kemlite breached several express and implied warranties and breached its supplier contract with Coachmen. A critical element in each of Coachmen's claims is proof of a defect in Kemlite's Filon which was the cause of Coachmen's damages. Under Indiana warranty law, "[a]ny action based on breach of warranty requires evidence showing . . . that the warranty was broken [and] that the breach of warranty was the proximate cause of the loss sustained." *Frantz v. Cantrell*, 711 N.E.2d 856, 860 (Ind. Ct. App. 1999). Similarly, causation is an essential element of a breach of contract claim. *Shepard v. State Auto Mutual Ins. Co.*, 463 F.3d 742, 744-45 (7th Cir. 2006). Thus, to prevail on its

claims at trial, Coachmen must be able to establish that Kemlite's Filon was defective and that this defect was the proximate cause of Coachmen's injuries.

Accordingly, Kemlite's motion for summary judgment focuses primarily on the issue of causation. Kemlite argues that, given the complexity of the issues, Coachmen can not establish causation without the assistance of expert testimony. Alternatively, Kemlite argues that, even with expert testimony, Coachmen can not provide sufficient evidence to establish causation under either the breach of warranty or breach of contract standards of proof.

Coachmen responds that expert testimony is not always required. Coachmen is correct, so long as there is sufficient evidence within a lay person's understanding to constitute a basis for a legal inference and not mere speculation. *Owens v. Ford Motor Co.*, 297 F.Supp.2d 1099, 1103 (S.D. Ind. 2003). However, expert testimony is required where the existence of a defect depends on matters beyond the common understanding of a lay juror. *Owens*, 297 F.Supp.2d at 1103-04; see also *Deimer v. Cincinnati Sub-Zero Products, Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) ; *Owens v. Amtrol, Inc.*, 94 F.Supp.2d 952, 957 (N.D. Ind. 2000). In the immediate case, even Coachmen's own experts agree that there are numerous factors which may have contributed to the distortion issue. Further, due to the presence of complex interactions of multiple raw materials, this is not a case of uncomplicated facts with only one logical conclusion to be inferred therein. *Cf. AAA Exteriors v. Don Mahurin Chevrolet and Oldmosbile, Inc.*, 429 N.E.2d 975, 1103-04 (Ind. Ct. App. 1981). Given the complexities involved, this Court finds that expert testimony is essential for Coachmen to establish a reasoned finding of liability on its claims. However, having already found Coachmen's expert, Dr. Hanks, qualified to testify as an expert and having found Mr. Burke qualified to give lay opinions regarding his testing, this Court finds that Coachmen can produce sufficient evidence to lay out a comprehensive case to a lay juror.

2.      Coachmen Has Produced Sufficient Evidence to Survive a Summary
        Judgment

With the inclusion of Dr. Hanks' expert testimony regarding chemical changes affecting

thermal stability of the Filon, supplemented by Francis Burke's lay testimony regarding changes

in both Kemlite and Coachmen's manufacturing processes, Coachmen has produced sufficient

evidence for a reasonable jury to conclude that Kemlite's product was defective and causally

responsible for Coachmen's damages.  However, Coachmen has not produced sufficient

evidence to establish that it is entitled to judgment as a matter of law.  In particular, the

testimony of Kemlite's expert Dr. Armstrong is sufficiently countervailing to suggest that a

factual issue regarding causation will require resolution by the requisite fact finder.

        a.      Coachmen's Breach of Warranty Claim

Under Indiana law, while it is necessary for Coachmen to establish that Kemlite's RCF

Filon was defective, Coachmen need not establish the specific defect in the Filon.  See *AAA*

*Exteriors*, 429 N.E.2d at 978.  Instead, Coachmen may circumstantially prove that the Filon was

defective.  Id.  Further, Indiana law suggests that,

> [A] malfunction in itself, in the absence of abnormal use and reasonable secondary
> causes, may be sufficient evidence of a defect in goods to make the existence of
> defect a question for the jury in an action for breach of implied warranty of
> merchantability.

Id.

Coachmen's primary argument is that for twenty years it purchased RVF Filon from

Kemlite without issue.  However, contemporaneous with changes in the chemical make up of

Kemlite's Filon, Coachmen claims that it began experiencing an unprecedented rise in the type

and number of Filon distortions in the field.  Coachmen's expert, Dr. Hanks, will testify that the

particular changes made to Kemlite's product could create the distortions at issue.  Further,

Coachmen's lay witness, Francis Burke will testify that no changes were made to Coachmen's manufacturing process prior to the spike in distortions. This evidence, if believed by a reasonable jury is sufficient to establish liability for breach of warranty under *AAA Exteriors* and Indiana law.

Kemlite argues that AAA Exteriors is not the property standard of liability for breach of warranty under Indiana law. In contrast, Kemlite argues that the standard of proof articulated in *Royal Bus. Machs, Inc. v. Lorraine Corp.* and *Advantage Eng'g, Inc. v. Burks Pumps, Inc.* is more appropriate. *Royal Business* states in applicable part,

> It is the law that a plaintiff may not recover for breach of express or implied warranty where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible and it is just as reasonable and probable that the injury was the result of one cause or the other.

*Royal Bus. Machs., Inc. v. Lorraine Corp.* 633 F.2d 34, 46 (7th Cir. 1980) (internal citations omitted). <u>See</u> <u>also</u> *Advantage Eng'g, Inc. v. Burks Pumps, Inc.,*1993 U.S. Dist. LEXIS 20084 *29 (S.D. Ind. July 23, 1993) (<u>affirmed</u> by *Advantage Eng'g, Inc. v. Burks Pumps, Inc.*, 1994 U.S.App. LEXIS 16500) (unpublished 7th Circuit opinion) (setting forth the same standard).

It is true that the particular facts of this case suggest potentially more than one factor at play in causation. Indeed, Coachmen's own expert and lay witnesses acknowledged that there were multiple variables which could have played a role in bringing about the distortion, several of which were outside of Kemlite's control.[7] In addition, Coachmen's witnesses acknowledged the difficulty they had in sufficiently isolating the variables, inhibiting their ability to opine

---

[7] <u>See</u> <u>e.g.</u> Hanks Dep., Doc. No. 145-6 at 3 (Dr. Hanks acknowledged that a change in Kemlite's resin was not the only casual factor); <u>Id</u>. at 4 (Dr. Hanks acknowledged that there were potentially "several" causal factors, some of which he may not have been able to identify); <u>Id</u>. at 3 (Burke noted that the root cause could potentially involve multiple factors interacting with each other); <u>see also</u> Hanks Dep., Doc. No. 145-6 at 4 (Dr. Hanks identifies other potential causal factors in creating the distortions), <u>see also</u> Hanks Dep., Doc. No. 145-8 at 2 (same).

regarding causation with absolute certainty.[8]  Indeed, none of Coachmen's experts could identify a "root cause,"[9] opining, instead, that Kemlite's Filon was "most likely" the cause of the distortions.[10]

However, to apply the *Royal Business* standard to the exclusion of the *AAA Exteriors* standard would improperly disrupt the wisdom and intent of both.  To be clear, this Court interprets the standard in *AAA Exteriors* as the "base" on which Coachmen must establish its *prima facie* case.  After which, the burden will shift to Kemlite to establish that other potential factors exist, which, either independent or in tandem with Coachmen's proffered factors, are sufficient to establish causation of the distortions at issue.  Should Coachmen succeed in its burden, this Court believes that a jury instruction will be sufficient to impress upon the fact finder, that, should it find that multiple causal factors exist, then Kemlite may not be found liable under a breach of warranty claim.  However, to determine that such a situation is present now, sufficient to negate the *AAA Exteriors* standard of proof from the outset, would itself require a factual finding.  Instead, having found that Coachmen has produced sufficient evidence to establish a *prima facie* case for breach of warranty, this Court finds that summary judgment in Kemlite's favor is unwarranted at this time. However, that said, this Court does not believe that

---

[8] See Hanks Dep., Doc. No. 145-6 at 5 (Dr. Hanks states, "there are multiple changes being made to both the Kemlite process and the Coachmen process during this time, and I don't think there's enough data, and maybe not possibly enough data, to be able to determine exactly why did that spike [in distortion claims] occur.").

[9] See e.g. R. Brach Dep., Doc. No. 145-10 at 2 (Brach Engineering, LLC testified that no one had determined a root cause of the problem); Hanks Dep., Doc. No. 145-6 at 2-3 (Dr. Hanks testified that no one had determined a root cause of the problem); Burke Dep., Doc. No. 145-5 at 3 (Burke testified that the root cause of the problem was never identified).

[10] See e.g. Hanks' Report, Doc. No. 145-14 at 2 ("[C]hanges in the Filon raw materials, processing, or formulation are most likely the main factor leading to the skin distortion failures"); Hanks' Supp. Report, Doc. No. 145-15 at 2 (The decrease in maleic anhydride "is most likely the key factor in initiating the skin deformation defect issue.").

Coachmen is entitled to summary judgment on this claim as a matter of law. Given the admission of the expert testimony of Dr. Armstrong, it is clear that a factual issue exists regarding defect and causation sufficient to potentially preclude Coachmen's recovery on this claim.

b. <u>Breach of Contract Claim</u>

Similarly, this Court believes that Coachmen has produced sufficient evidence to avoid summary judgment on its breach of contract claim, particularly given the lower standard of proof under Indiana law. "[T]he test of causation in common law contract actions is not whether the breach was the only cause, . . . but whether the breach was a substantial factor in bringing about the harm." *Fowler v. Campbell*, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993). Under Indiana law, a party injured by a breach of contract must prove by a preponderance of the evidence that the breach was the cause in fact of its loss. *Thor Elec. Inc. v. Oberle & Ass., Inc.*, 741 N.E.2d 373, 381 (Ind. Ct. App. 2000); *Rollins Burdick Hunter of Utah, Inc. v. Board of Trs. of Ball State Univ.*, 665 N.E.2d 914, 922 (Ind. Ct. App. 1996).

<u>Thor Elec.</u> defines cause in fact as,

> For a cause in fact to be a legal cause, it must have been a substantial factor in bringing about the harm. While there may be other contributing causes and more than one factor operating, the trier of fact may determine that one cause predominates over another in bringing about the harm.

*Thor Elec.*, 741 N.E.2d at 381. <u>See</u> <u>also</u> *Parke State Bank v. Akers*, 659 N.E.2d 1031, 1034 (Ind. 1995); *Fowler v. Campbell*, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993).

Coachmen argues that, even though its experts opine regarding causation in terms such as "likely" and "most likely," such testimony is sufficient to meet the lower, "substantial factor," standard of proof under Indiana contract law. Further, Coachmen cites *Noblesville Casting Div.*

*of TRW, Inc. v. Prince*, to suggest that expert testimony need not be framed in certain terms to support a jury verdict. See *Noblesville*, 438 N.E.2d 722, 731 (Ind. 1982) ("The degree of certainty in which an opinion or conclusion is expressed concerns the weight to be accorded the testimony, which is a matter for the jury to resolve."). This Court agrees.

Unlike its breach of warranty claim, all Coachmen must do to establish liability under its breach of contract claim is establish one causal factor sufficient for a reasonable jury to conclude that it is more likely than not the cause in fact of Coachmen's damages. The evidence submitted by Coachmen is sufficient to establish that burden. However, as with its breach of warranty claim, factual issues exist which preclude awarding summary judgment in Coachmen's favor on its contract claim, particularly given the numerous potential factors in this case.

Further, although Kemlite argues that it is entitled to summary ruling regarding Coachmen's failure to pay on the invoices because Coachmen failed to respond to its brief argument in its summary judgment motion, this Court does not believe such relief is warranted at this time. While it is normally the case that an unopposed argument is presumed to be conceded, this Court believes that it would be premature to award judgment on the issue of Coachmen's withholding of payment on Kemlite's invoices. The express language of the contract at issue states,

> Supplier agrees to reimburse Coachmen for any warranty expense incurred by Coachmen and to provide Coachmen with replacement parts." Supplier agrees to indemnify Coachmen and hold it harmless from any claims or expense including attorney's fees, arising from defects in supplier's products or from supplier's breach of this agreement."

CP-102 Contact, Doc. No. 160-13 at 3. As such, if Coachmen is successful in establishing that Kemlite breached its contractual or warranty obligations, then Coachmen may have been entitled

under the contract to withhold its payment obligation.  Until such liability is determined, the issue of Kemlite's recovery under the invoices is not ripe.

V.    CONCLUSION

Accordingly, Kemlite's motions to exclude the expert testimony of Branch Engineering and Francis Burke are **GRANTED**.  [Docs. No. 140 & 142].  However, Kemlite's motion to exclude the testimony of Dr. Hanks is **DENIED**.  [Doc. No. 137].  Similarly, Coachmen's motion to exclude the testimony of Dr. Armstrong is also **DENIED**.  [Doc. No. 138].  In addition both Coachmen and Kemlite's motions for summary judgment are **DENIED**.  [Docs. No. 138 & 144].  Finally, having held a hearing on these motions on October 28, 2008, this Court **DENIES AS MOOT** both party's motions for oral argument. [Docs. No. 146 & 157].

The parties are reminded that this case has been set for a two-and-one-half week trial, on the issue of liability, to begin on January 13, 2009.

**SO ORDERED.**

Dated this 10th Day of November, 2008.


 S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge